IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

GARY JOSEPH JACKSON,

      **Plaintiff,**

**vs.**                              **CIVIL ACTION NO. 2:16-03116**

**CAROLYN W. COLVIN
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. By Standing Order entered April 1, 2016 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 11 and 12.)

The Plaintiff, Gary Joseph Jackson (hereinafter referred to as "Claimant"), filed an application for DIB on December 14, 2012 (protective filing date), alleging disability as of August 31, 2012, due to chronic low back pain[1]. (Tr. at 147, 148-151, 174.) Claimant's application was denied initially on April 9, 2013 (Tr. at 78-88.) and upon reconsideration on September 10, 2013. (Tr. at 94-100.) On November 8, 2013, Claimant requested a hearing before an Administrative

---

[1] In his Disability Report dated May 15, 2013, Claimant indicated that his lower back pain had gotten worse since January 2013 and that he started having left hip pain. (Tr. at 191.)

Law Judge (ALJ). (Tr. at 101-102.) The hearing was held on October 9, 2014, before the Honorable

Peter Jung. (Tr. at 25-45.) By decision dated November 7, 2014, the ALJ determined that Claimant

was not entitled to benefits. (Tr. at 11-20.) The ALJ's decision became the final decision of the

Commissioner on February 2, 2016 when the Appeals Council denied Claimant's request for

review. (Tr. at 1-6.) On April 1, 2016, Claimant brought the present action seeking judicial review

of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Standard

Under 42 U.S.C. § 423(d)(5) and §1382c(a)(3)(H)(I), a claimant for disability benefits has

the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).

A disability is defined as the "inability to engage in any substantial gainful activity by reason of

any medically determinable impairment which can be expected to last for a continuous period of

not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of

disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2013). If an individual is found "not disabled"

at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under

the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§

404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from

a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third

inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1

to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does,

the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether

the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§

404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a <u>prima facie</u> case of disability. <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2013). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently,

appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant had met the requirements for insured worker status through March 31, 2017. (Tr. at 13, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, August 31, 2012. (Id. at Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: lumbar pain syndrome and degenerative disc disease of the lumbar spine status-post back surgery. (Tr. at 14, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 16, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform sedentary work as defined in the regulations with the following exceptions:

5

[H]e can lift and carry ten pounds occasionally and less than ten pounds frequently. He can stand and walk two hours in an eight-hour workday and sit six hours in an eight-hour workday. The claimant can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. He can occasionally balance, stoop, kneel, crouch, and crawl. The claimant must avoid concentrated exposure to extreme cold, extreme heat, wetness, and vibration, and avoid all exposure to hazards, machinery, and heights. (Id. at Finding No. 5.)

At step four, the ALJ found that Claimant was unable to perform past relevant work. (Tr. at 19, Finding No. 6.) At step five of the analysis, the ALJ found Claimant was thirty-one years old as of the onset date of disability, which is defined as a younger individual. (Id. at Finding No. 7.) The ALJ found that Claimant had at least a high school education, and could communicate in English. (Id. at Finding No. 8.) Employing the Medical-Vocational Rules as a framework, the ALJ determined that Claimant was not disabled, that transferability of job skills was immaterial to the determination of disability, as Claimant's age, education, work experience, and residual functional capacity indicated that there were other jobs existing in significant numbers in the national economy that Claimant could perform. (Id. at Finding No. 9 and Finding No. 10.) On this basis, benefits were denied. (Tr. at 20, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving

conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was born on October 27, 1980 and was nearly thirty-four years old at the time of the administrative hearing on October 9, 2014. (Tr. at 30.) Claimant graduated high school and had one year of trade school; he was able to communicate in English. (Tr. at 30.) He previously worked as a laborer, loader, and carpet cleaner. (Tr. at 32-33.)

<u>The Medical Record</u>

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

<u>Physical Impairment Records</u>

<u>St. Francis Hospital Radiology Reports:</u>

An MRI of Claimant's lumbar spine taken on March 27, 2007 indicated a normal alignment of the lumbar vertebral with preservation of vertebral body height, and no pathologic signal intensity change of underlying bone marrow was demonstrated; at the L4 and L5 diffuse posterior disc bulge resulted in mild degree of central canal stenosis, and at the L5 to S1 level, left paracentral disc protrusion with extrinsic mass compression on the existing left S1 spinal nerve root with left sided foraminal stenosis was demonstrated. (Tr. at 248-249, 369-370.) Another MRI of Claimant's lumbar spine on July 17, 2009 indicated changes of disc degeneration and annular

7

tear at L5-S1, and a focal extradural density in the midline and to the left side encroaching on the left S1 nerve root that was suspicious for a disc herniation. (Tr. at 247, 368.)

<u>Thomas Memorial Hospital:</u>

On June 1, 2011, Claimant presented to the emergency room because of back pain that ran down from his lumbar area to his left foot that he sustained pulling fencing out of the ground at home. (Tr. at 359-362.) He was treated conservatively with an injection and pain medication and advised to limit lifting, no strenuous activity and to not work for two days; he was discharged that day. (Tr. at 361.)

Claimant returned to the emergency department for right shoulder pain on November 20, 2011. (Tr. at 354-358.) X-rays were negative for fracture or dislocation; the clinical impression was muscle strain right shoulder. (Tr. at 356.) He was to continue his current medications and provided ibuprofen 600 mg for pain and Zanaflex for muscle spasm. (<u>Id</u>.)

On July 21, 2012, Claimant presented to the emergency room due to a headache that he described as sciatica pain going all the way up his spine into his head. (Tr. at 342.) A CT scan of his head was negative (Tr. at 353.), leaving a clinical impression of acute headache. (Tr. at 346.) He was discharged in stable condition with a prescription for Fioricet for headache. (<u>Id</u>.)

<u>Hope Clinic:</u>

From July 23, 2012 through July 25, 2013, Claimant was treated at Hope Clinic for his chronic low back pain; he was treated conservatively with narcotics. (Tr. at 259-292.) On August 16, 2012, Claimant reported no side effects from his medications, and that they were helping, but then would wear off. (Tr. at 273.) By October 1, 2012, Claimant reported that his pain was worsening and that the pain medication was not working; he reported no side effects from his pain

relief; pain medication was increased. (Tr. at 268.) On December 3, 2012, Claimant reported having pains throughout day and was prescribed oxycodone 15 mg and Percocet 10/325 mg. (Tr. at 264.) A report dated January 2, 2013 indicated that Claimant was improving, and was going to have shoulder surgery and requested preoperative pain management. (Tr. at 261.) On January 28, 2013, Claimant reported that he was not sleeping well and had inadequate pain control; his pain medications were increased accordingly. (Tr. at 259.) On March 25, 2013, it was noted that Claimant was worsening at night due to recent work activity; he was continued on his pain medication regimen. (Tr. at 287.) By July 25, 2013, it was noted that Claimant was improving. (Tr. at 289.)

State Agency Medical Examiner:

On March 19, 2013, Dr. Kip Beard, M.D. examined Claimant for his chronic low back pain. (Tr. at 252-258.) Claimant reported that he had been in a motor vehicle accident in 1997 and a lifting injury at work in 2007. (Tr. at 252.) He rated his pain at 10/10 with radiation down his left leg to the foot. (Id.) He reported no other medical conditions. (Tr. at 253.) Claimant exhibited a gait with a mild limp on the left; he required no ambulatory aids and could stand unassisted. (Tr. at 254.) He was able to arise from a seat and step up and down from the examination table without difficulty; he seemed uncomfortable seated and Dr. Beard noted him to stand during a portion of the examination. (Id.) Claimant was uncomfortable supine with back pain. (Id.) Claimant's cervical spine revealed no tenderness, or paravertebral muscle spasm and a normal range of motion. (Id.)

Dr. Beard's examination of Claimant's lumbosacral spine and hips indicated a dorsolumbar spine with normal curvature; Claimant complained of moderate pain with forward bending, with

9

paravertebral tenderness with paravertebral rigidity but no spasm noted. (Tr. at 255.) Claimant had a normal range of motion; hips had a normal range of motion. (Id.) Claimant had diminished sensation in the left foot that represented a combination of L4-S1 distribution, and mild weakness for plantar flexion on the left that Dr. Beard graded 4/5; Dr. Beard found no atrophy. (Id.) Claimant could heel-walk, toe-walk, tandem walk, and squat. (Id.) Dr. Beard determined that Claimant had left S1 lumbar radiculopathy with chronic thoracolumbar strain. (Id.) An x-ray taken on March 19, 2013 of Claimant's lumbar spine indicated no significant degenerative process. (Tr. at 257.)

State Agency Medical Consultant:

On April 1, 2013, State agency physician Dominic Gaziano, M.D., reviewed Claimant's medical records and opined that he remained able to perform a range of light work. (Tr. at 47-54, 57-65.) Dr. Gaziano opined Claimant could lift and carry 20 pounds occasionally and 10 pounds frequently and was unlimited in his ability to push and/or pull except for those weight limitations. (Tr. at 52, 62-63.) Dr. Gaziano further opined that Claimant could sit, stand, or walk about six hours in an 8-hour workday; his postural limitations were that he could occasionally climb ramps/stairs, climb ladders/ropes/scaffolds, balance, stoop, kneel, crouch, and crawl. (Tr. at 52-53, 62-63.) Dr. Gaziano opined that Claimant had no manipulative, visual, communicative, or environmental limitations. (Tr. at 53, 63.) Dr. Gaziano could find no good reason for Claimant's weakened grasp. (Id.)

On September 9, 2013, State agency physician Pedro F. Lo, M.D. reviewed Claimant's medical records and opined that he remained able to perform a range of light work. (Tr. at 66-74.)

St. Mary's Medical Center:

On May 6, 2014, an MRI of Claimant's lumbar spine indicated no significant changes since the 2009 images. (Tr. at 363, 393.) That same date, an MRI of Claimant's cervical spine appeared normal with mild degenerative changes, with mild disc bulging at C3-4, C4-5 levels, a disc bulge at C6-7, but no neural foraminal compromise. (Tr. at 364, 394.)

A note dated June 4, 2014 indicates that Claimant saw Dr. Adam Breinig, D.O. seeking a neurological consult for permanent relief from his chronic low back pain. (Tr. at 400-401.) A physical examination revealed that Claimant had full range of motion in all four extremities, no muscle atrophy, a normal gait, and no lower extremity edema. (Tr. at 401.)

On September 14, 2014, Dr. Breinig referred Claimant to St. Mary's Neurosurgery, LLC for a surgical consult: it was noted that he had full cervical/lumbar range of motion, no evidence of paraspinal muscle spasm, no point tenderness, no bony step-offs, 5/5 strength in the upper and lower extremities with normal muscle bulk and tone. (Tr. at 391.) Claimant exhibited intact memory, and was oriented to all three spheres. (Id.) Straight leg raise testing was positive in the left leg. (Tr. at 392.) The plan was that Claimant undergo a left-sided L5/S1 microdiscectomy and hemilaminotomy. (Id.) On September 24, 2014, Claimant had surgery; his post-operative diagnosis was left L5-S1 herniated nucleus pulposus and neural foraminal stenosis. (Tr. at 403-404.) During a follow-up examination on October 13, 2014, Claimant told his surgeon that he "saved his life" and that his pain was essentially gone after surgery and that he was able to do things with his daughter again that he had been unable to do prior. (Tr. at 405-408.) Overall, the surgeon opined Claimant was doing "incredibly well" and would be seen on "an as needed basis". (Tr. at 405, 407.)

Mental Impairment Records

Prestera Mental Health Center:

On May 20, 2010, Claimant presented to Prestera for symptoms of anxiety, panic attacks, depression, poor concentration, sleeping problems, and irritability. (Tr. at 380.) He reported that he can function independently, but his psychiatric problems prevented him from finding and holding down a job. (Tr. at 381.) On June 17, 2010, during a comprehensive diagnostic psychiatric evaluation, Claimant reported that his "anxiety and stress and panic are out of sight." (Tr. at 386.) A mental status examination indicated that he was cooperative, had normal speech, a sad mood, broad affect, and no suicidal/homicidal ideations; his thought process and content were logical and goal oriented. (Tr. at 388.) No hallucinations, delusions, illusions, or paranoia were reported; he was alert and oriented to time, person, and place. (Id.) Claimant's memory for immediate, recent remote events was intact, and his insight and judgment were fair. (Id.) He was diagnosed with mood disorder, history of cannabis abuse in remission, history of alcohol dependency in remission, generalized anxiety disorder, and insomnia; his GAF score was 60[3]. (Tr. at 389.) He was prescribed Vistaril and Lamictal. (Id.)

Alexander V. Otellin, M.D.:

Claimant began treatment with Dr. Otellin on January 30, 2014 for symptoms of depression and anxiety. (Tr. at 331.) Dr. Otellin diagnosed panic disorder with agoraphobia and prescribed medication. (Tr. at 333.) By February 20, 2014, Claimant denied depressive symptoms and reported improvement in anxiety. (Tr. at 335.) Claimant's mental status examination revealed no

---

[3] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994.)

serious abnormalities; he did not exhibit depression or mood elevation; his speech was normal; he denied suicidal ideation; he had no hallucinations; and his behavior was generally appropriate. (Id.) Claimant's associations were intact, his thinking was logical, and his thought content was appropriate. (Id.) There were no signs of cognitive difficulty, his memory was intact, and he was oriented to time and place. (Id.) Claimant exhibited no signs of anxiety, a normal attention span, and his judgment and insight appeared intact. (Tr. at 335-336.) Dr. Otellin diagnosed Claimant with panic disorder with agoraphobia and depressive disorder due to another medical condition versus depressive features. (Tr. at 336.) Dr. Otellin adjusted Claimant's medications to Klonopin, Xanax, Celexa and Tegretol. (Id.)

On March 18, 2014, Claimant reported to Dr. Otellin, "I feel good. Everybody see that. I enjoy life". (Tr. at 338.) Due to his progress, Dr. Otellin continued Claimant's prescriptions for Lexapro and Celexa. Claimant had a euthymic mood with no signs of depression or anxiety. (Tr. at 339.) On May 12, 2014, he continued to report improvement in his depressive symptoms and his mental status examinations continued to be unremarkable; Dr. Otellin noted that Claimant "exhibits neither depression nor mood elevation" and "[t]here are no signs of anxiety". (Tr. at 371-372.) Dr. Otellin discontinued Claimant's prescriptions for Klonopin and Celexa, and increased Xanax. (Tr. at 372.) On June 11, 2014, Claimant reported that his mood was better, and he denied depressive symptoms; he reported that depressive moods typically occurred a few times a month, his sleeping difficulty had improved, and his symptoms of sadness decreased. (Tr. at 374-376.) Again, Dr. Otellin found no signs of anxiety. (Tr. at 375.) Because Tegretol interacts with Xanax, Dr. Otellin increased Claimant's dose of Xanax. (Id.) On July 31, 2014, Claimant reported that he was "doing a little better", and was "slightly improved, thus far"; Claimant denied depressive

symptoms that day, but he indicated that they lessened in frequency or intensity. (Tr. at 377.) Claimant reported that his depressive moods occurred a few times per month, but there was an improvement in his sleeping difficulty and symptoms of sadness have decreased; Dr. Otellin found no signs of anxiety. (Tr. at 377-378.) Dr. Otellin continued prescriptions for Xanax, Tegretol, and Lexapro; Claimant was to return in three months or earlier, if needed. (Tr. at 378.)

Thomas Memorial Hospital:

On February 3, 2014, Claimant presented to Thomas Memorial Hospital for suicidal thoughts as a result of his chronic low back pain[4], as well as depression and anxiety; a psychological/neurological examination revealed that he was oriented x3, normal mood and affect, normal speech, normal cognition, normal thought process and content, and normal insight and judgment. (Tr. at 304.) Claimant was kept on a 96-hour hold and was discharged on February 10, 2014, his Global Assessment of Functioning at the time of discharge was 59[5]. (Tr. at 310.) At discharge, Claimant's prescribed medications were Lexapro, amoxicillin (for sinus infection) Carbamazepine, Trazodone, Temazepam (for insomnia), Klonopin, and oxycodone. (Id.)

State Agency Psychological Consultant:

On April 9, 2013, State agency psychologist, Philip E. Comer, Ph.D., determined that Claimant's school records did not indicate any mental or emotional diagnoses or severe limitations. (Tr. at 61.) On September 7, 2013, State agency psychologist, Paula J. Bickham, Ph.D., determined that Claimant was uncooperative with the adjudication process and there was insufficient evidence to evaluate his claim at the reconsideration level. (Tr. at 71.)

---

[4] He denied this later when he returned to Dr. Otellin on February 20, 2014: "I was in Thomas Hospital for a week. I felt depressed, couldn't sleep. I had to tell them I attempted suicide. I didn't, I just felt anxious and down." (Tr. at 335.)
[5] See footnote 3, supra.

The Administrative Hearing

Claimant's testimony:

Claimant testified that most jobs he had since 2008 lasted no longer than six months to a year, mainly because of his back pain and his bipolar. (Tr. at 32, 34.) He "threw [his] back out" in a car wreck in 1997 and injured it again in 2007 while unloading trucks. (Tr. at 33.) Claimant testified that his back pain continued to get worse since then, and the pain ran down his left side into his foot. (Tr. at 33-34.) Claimant testified that he can sit for about ten to fifteen minutes before he has to stand up due to pain, then he has to walk around for about ten to fifteen minutes afterwards before he can sit again; he has pain standing in one place, he has to constantly alternate positions. (Tr. at 35-36.) Claimant testified that since his recent back surgery, that he constantly tries to find a comfortable position to relieve his pain. (Tr. at 36.)

Regarding his psychological issues, Claimant testified that he felt helpless, that he lost patience, and that he became irritable, causing him trouble at home. (Tr. at 38.) Claimant testified that he still had pain that went down into his left foot and that it caused his left leg and foot to go numb; even two weeks out from surgery, Claimant testified that he had pain in his lower to mid back when he lifts his leg up. (Tr. at 39.)

Patricia Posey, Vocational Expert ("VE"):

Ms. Posey testified that Claimant's past relevant work as a material handler or loader was classified as heavy, semiskilled (Tr. at 41.), his past relevant work in construction was classified as heavy, unskilled (Id.), and his past relevant work as a pizza delivery and appliance delivery person was classified as medium, unskilled. (Tr. at 42.) The VE opined that with Claimant's physical restrictions, he could not perform past relevant work, but could find other work at

sedentary levels. (Tr. at 43.) The VE opined that there would not be any jobs if Claimant was limited to standing and walking one hour in an eight-hour workday or needed to sit, stand or walk around at will for five to ten minutes at each postural position. (Id.)

Claimant's Challenges to the Commissioner's Decision

Claimant argues that the ALJ failed to develop the record concerning his mental impairments. (Document No. 11 at 5-10.) Claimant contends that there were "evidentiary gaps" in his claim that prejudiced him as envisioned by Blankenship v. Astrue, 2012 WL 259952 (S.D.W.Va. Jan. 27, 2012) (unpublished)[6] (Id. at 6.) Claimant argues that this was evident by the ALJ's acknowledgement that the State agency consultant opined that she had little evidence upon which to assess his condition. (Id. at 7.) The ALJ noted Claimant's mental health records that developed since the opinion was provided by the State agency consultant, and impermissibly substituted his own lay opinion finding Claimant's mental impairment not severe. (Id. at 7-9.) This illustrated the "evidentiary gap" that the ALJ failed to develop without obtaining another expert opinion, which was also reflected in the ALJ's RFC assessment because it failed to include any of Claimant's mental impairments. (Id. at 9.) Claimant argues that the ALJ's error was further manifested in his defective hypothetical to the VE by failing to include his mental impairment pursuant to the holding in Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (internal citations omitted). (Id. at 10.) Because of these errors, remand is necessary. (Id.)

The Commissioner responds that the ALJ did properly develop the record. (Document No. 12 at 5-11.) The Commissioner points out that the claimant bears the burden of proving a disability,

---

[6] The undersigned notes that in the Blankenship case, the Court determined the claimant had not met her burden proving that the ALJ failed to develop the record or that there was a prejudicial evidentiary gap. It is further noted that the ALJ therein found the claimant's mental impairments "severe", which is a finding that distinguishes the matter to the case at bar.

and when he has representation, presumably, the best case for disability will be made (Id. at 6.); at no point did Claimant or his counsel ask for assistance in obtaining additional mental health records or for a psychological consult. (Id.) The Commissioner argues that pursuant to the Regulations, the ultimate responsibility for deciding an impairment's nature and severity rests with the ALJ. (Id. at 7.) Further, the Commissioner contends that the ALJ is not required to obtain a consultative examination, as such decisions are discretionary under the Regulations. (Id. at 8.) Moreover, the Commissioner states that the record did not support a finding of a severe mental impairment; Claimant's application for disability was premised on low back pain. (Id. at 9.)

The Commissioner argues that the ALJ found Claimant had mild to no restrictions due to any mental impairments, and that the evidence showed Claimant responded well to treatment with Dr. Otellin. (Id. at 9-10.) Because the evidence showed Claimant's mental health was overall improved, there was no need for a psychological consult. (Id. at 11.) The Commissioner argues that Claimant fails to identify any mental impairments the ALJ did not consider in his RFC assessment, and further, that the party claiming the error has the burden of showing what error was made. (Id.) In sum, the Commissioner contends that the ALJ's decision is supported by substantial evidence. (Id. at 12.)

Analysis

Claimant contends the ALJ erred by failing in his duty to develop the record concerning Claimant's mental impairments, that said error was further manifested in the RFC assessment, in the hypothetical to the VE, and ultimately, in the decision finding no disability.

In Cook v. Heckler, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986). The Court stated

17

that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." Id. The Court explained that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's arthritis claim, in order to determine if it met the requirements in the listings of impairments, amounted to a neglect of his duty to develop the evidence. Id. Nevertheless, it is Claimant's responsibility to prove to the Commissioner that he is disabled. 20 C.F.R. § 404.1512(a). Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that he has an impairment. Id. § 404.1512(c). In Bowen v. Yuckert, the Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . . If the process ends at step two, the burden of proof never shifts to the Secretary. . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as a claimant's counsel. Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994). Claimant bears the burden of establishing a prima facie entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

At step two, the ALJ noted Claimant's alleged symptoms of anxiety and depression and proceeded to follow the "special technique" to evaluate those impairments pursuant to 20 C.F.R. § 404.1520a(a). (Tr. at 14-15.) The ALJ described the findings in Claimant's mental health records, the majority of which were from his treating physician, Dr. Otellin, documenting Claimant's positive response to medications and improvement in his mental health since he started treatment. (Tr. at 14.) The ALJ took note of Claimant's six-day hospitalization at Thomas Memorial Hospital for severe depression and suicide attempt, which Claimant denied when he returned to Dr. Otellin. (Id.) The ALJ further reviewed the medical evidence that developed after his hospitalization in early February 2014: Dr. Otellin's treatment note dated February 20, 2014 regarding Claimant's mental status examination indicated progress: no abnormalities, normal thought processes, normal speech, no signs of depressed mood or anxiety, intact judgment and insight, no suicidal ideation, intact memory for recent and remote events, no signs of cognitive difficulty. (Id.) The records show that as Claimant continued treatment under Dr. Otellin's care, he denied symptoms relating to depression or anxiety. (Id.)

The ALJ rated Claimant's degree of functional limitations resulting from his alleged mental impairments pursuant to 20 C.F.R. § 404.1520a(c). First, the ALJ found Claimant mildly impaired in activities of daily living, as Claimant denied symptoms of anxiety after starting medication, and testified that his limitations in daily living were caused by his physical impairment. (Tr. at 15.) Next, the ALJ found Claimant mildly impaired in social functioning due to Claimant's testimony that he did not like to be around people because he was irritable from his pain, and due to his positive response to medication in the records provided by Dr. Otellin. (Id.) Third, the ALJ found Claimant had no difficulties in maintaining concentration, persistence or pace because no evidence so

indicated. (Id.) Lastly, the ALJ found Claimant had no episodes of decompensation as defined by the Regulations, again taking note of Claimant's denial of the suicide attempt during his hospitalization, and no evidence that the hospitalization was part of a longer episode of decompensation. (Id.)

After considering all the medical evidence and Claimant's testimony, the ALJ's determination that Claimant had difficulties rated as "mild" or "none" in the first three areas of functioning and "none" in the fourth area of functioning, the ALJ properly concluded Claimant's mental impairments were not severe under 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1). (Id.)

As discussed above, the evidence showed Claimant enjoyed continued improvement under Dr. Otellin's care, which contained no inconsistencies or insufficiencies that would give the ALJ cause to take additional action to reconcile the information in order to make a decision as described in 20 C.F.R. § 404.1520b(c)(1)-(4). In short, Claimant's argument that the ALJ failed to develop the record lacks merit.

Claimant has argued that because the State agency psychological consultant did not have access to these mental health records, this represented an "evidentiary gap" that prejudiced his claim for disability benefits. (Document No. 11 at 6.) "To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result." Carey v. Apfel, 230 F.3d 131, 142 (5th Cir. 2000). Claimant has not demonstrated what other evidence might have altered the ALJ's decision. However, Claimant contends that the ALJ's determination that his mental impairments were non-severe was essentially his layperson opinion supplanted in lieu of an expert opinion. (Document No. 11 at 7.) The Court has recognized that "in the absence of any psychiatric or psychological evidence to support his position, the ALJ does not

possess the competency to substitute his own views on the severity of plaintiff's psychiatric problems for that of a trained professional." Grimmett v. Heckler, 607 F.Supp. 502, 503 (S.D.W.Va. 1985) (emphasis added). Though the ALJ assigned "little weight" to the State agency psychological consultant's opinion because she did not have access to Dr. Otellin's treatment notes or records from Claimant's hospitalization (Tr. at 15.), there was ample evidence in the record supporting the ALJ's finding that Claimant's mental impairments were non-severe, a permissible determination pursuant to the Regulations as noted above. Accordingly, Claimant's argument that the ALJ's determination that Claimant's mental impairments were non-severe as the product of his own opinion lacks merit.

Claimant further contends that the ALJ's unsupported finding that his mental impairments were non-severe negatively impacted his RFC assessment and were disregarded in the hypothetical to the VE. (Document No. 11 at 9-10.) Because the ALJ's determination that Claimant's mental impairments were non-severe was supported by the evidence, and was a proper evaluation under the Regulations, these remaining arguments fall flat.

For starters, the RFC determination is an issue reserved to the Commissioner. See 20 C.F.R. §§ 404.1546, 416.946. Moreover, this jurisdiction recognizes that "an ALJ is not required to obtain an expert medical opinion as to a claimant's RFC." Hampton v. Colvin, 2015 WL 5304294, at *28 (S.D.W.Va. Aug. 17, 2015), adopted by, 2015 WL 5304292 (S.D.W.Va. Sept. 9, 2015) (emphasis in original) (citing cases); SSR 96-5p, 1996 WL 371483, at *5 ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the RFC assessment."). The ALJ explained that Claimant's functional limitations were used to rate the

severity of his mental impairments at steps 2 and 3 of the sequential evaluation process. (Tr. at 15.) Further, the ALJ stated that the RFC assessment reflected the degree of limitation he found in the "paragraph B" mental function analysis as described above. (Tr. at 16.)

At steps four and five of the sequential analysis, an ALJ must determine a claimant's RFC for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Looking at all the relevant evidence, the ALJ must consider a claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545, 416.945. "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Social Security Ruling 96-7p clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements.

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her

ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

With regard to Claimant's alleged symptoms of depression and anxiety, the ALJ properly considered the entire medical record which indicated he had a positive response to treatment, to the point that he no longer exhibited symptoms of depression or anxiety, which supported the finding that they caused no significant limitation in his ability to work, and which therefore was not a significant factor in assessing the RFC. (Tr. at 16.) However, because objective medical evidence supported Claimant's alleged symptoms of pain as a result of his severe impairments related to his back, those considerations took center stage in the RFC assessment and in the hypothetical to the VE. In this case, the VE was present during the entire hearing, and she testified that she reviewed the exhibit files prior to the hearing, and was familiar with Claimant's work history. (Tr. at 41.) In response to the hypothetical posed by the ALJ, which included Claimant's abilities and limitations based on his severe physical impairments, his age, and education, she opined that he was capable of sedentary work. (Tr. at 41-43.) Indeed, Claimant's counsel expanded the ALJ's hypothetical to the VE to include additional restrictions due to his pain symptoms from his physical impairments, not mental limitations. (Tr. at 43-44.) There is no evidence to suggest

that the hypothetical(s) submitted to the VE in this matter deviated from the holding espoused in Walker v. Bowen, 889 F.2d 47 (4ᵗʰ Cir. 1989); the VE was made aware of Claimant's abilities and limitations by the ALJ in his hypothetical. (Tr. at 42-44.)[7], and thus supported a finding of "not disabled." (Tr. at 20.)

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's Motion for Judgment on the Pleadings (Document No. 11.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 12.), and **AFFIRM** the final decision of the Commissioner.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

---

[7] The undersigned notes that at Claimant's counsel's request, the ALJ kept the record open for the submission of additional medical evidence after the hearing, which included the surgical report and post-operative follow-up appointment regarding Claimant's back surgery. (Tr. at 402-408.) The ALJ took note of Claimant's statements to his surgeon being in "stark contrast" to his testimony only four days earlier regarding his allegations of disabling symptoms and functional limitations. (Tr. at 18.) "Nevertheless, in consideration of the claimant's recent surgery and in viewing the evidence in the light most favorable to the claimant, the [ALJ] further limit[ed] the claimant to sedentary work[.]" (Tr. at 18-19.)

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk of this court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: October 12, 2016.

Omar J. Aboulhosn
United States Magistrate Judge